Good morning, your honors. Morning, counsel. Frank Prantill, I represent the appellant here, your honor. Before getting to the question what this case is about, I'd like to kind of go back over a little bit of the history of the case. Mr. Austin, in 1987, became aware of a problem with his sentence. He thought he was to receive a concurrent sentence, and the CDC advised him that he had a consecutive sentence, two consecutive life sentences, or 20 years or whatever it was. And he immediately filed a 602 to get some clarification. Nine years later, the CDC answered him after eight requests during this period of time. Where did he immediately file? A 602. That's an appeal process for inmates. And it's a way that you say, well, something's wrong with the situation here, and you have to go to the immediate counselor. Then it goes to another level, eventually ends up before the director of corrections. And, of course, they're going back and forth to the court, supposedly the CDC. And so finally in 1986, November or excuse me, August 23, 1996, he finds out that the sentence is consecutive. And at that point, he starts his litigation. And so I believe that the starting point is A2396 when he's finally advised. Now, he goes through two rounds. He tries a round in 1996. He files in November of 1996 at the superior court level. It's denied. He files at a couple of levels there. And then he kind of drops it, and he starts a second round on A72897 when he files a petition with the superior court, which is denied in August. Then he files a petition before the court of appeal on September 4, 1997. And then that petition is denied by the California court of appeal on the 23rd of September. Now, then there's a gap, and this is the question. There's a gap of eight and a half months between September of 97 and July of 98. Now, during that gap, he retains counsel and he gathers his evidence. And counsel then files a petition before the California Supreme Court on July 8, 1998, which is denied in March of 99. And then he's in federal court within the 30 days. So the question is whether or not this eight-and-a-half-month delay between when he was representing himself and when he retained counsel to file the Supreme Court petition, whether or not this is an unreasonable delay under California law. Now, there may be another question in here that he started his first habeas and then stopped it and never pursued it. But I'm just wondering whether – I don't think that matters, Your Honor, because it's still timely even if we take that July, the first date, that July 97 date. He's still well within. I mean, I've calculated the time. That's if we accept your statement that time begins running when he gets his final statement from the corrections department. Correct. And the reason I say that is because the CDC as well as the court is looking at what the proper sentence was. In other words, he went – he did what he thought he had to do to challenge this. And he's waiting for a decision from the CDC as well as the superior court. And he gets – what was the date he got that again, the CDC decision? It was August 23rd, 1996. So if you take that as a starting point – Do we have that CDC decision in the excerpts? It's stated by both sides. I don't think we'd question that. Okay. And if you take that as a starting date, there's 339 days from 8-23-96 to 7-28-97. So that's well within one year. So if we accept your starting date, the first habeas is just irrelevant. Yeah. That's the way I look at it. I mean, you can go the other way and calculate it. It's a little bit better for me, but I think it's more clear this way. So now the question is whether or not that eight-and-a-half-month delay between when he represented himself and when he got an attorney to do the petition to the California Supreme Court, whether or not that is an unreasonable delay under California law. If it is, then it's not pending and the case is not told. Why did he have to wait for his CDC decision? It looks to me as though – well, I'm not sure I'm reading these California papers right, but it looks as though consecutive was right in there in his original – oh, this isn't a judgment. It's a report of probation officer. Right. Judgment didn't have the word consecutive? Well, he – you know, you go to prison, you get a sentence, you go to the reception center, you spend time adjusting, you never talk to your counselor. I mean, counselor's a joke. I mean, there's no counseling in prison, but basically that's what they call them. Do you get a copy of your judgment? No, not really. And then you go up and you question it because you start worrying when you're going to get out after you've been in there for a little while. And that's when he became aware in 87, Your Honor, something's wrong here. I thought I was going to get a concurrent sentence here, not two consecutive sentences. Now, so I believe that this is a question of California law, and before this Court can say his petition is not pending, that law has got to be clear and consistently applied by California, and it's not. If you look at SAFL 2, is it what I call it, 312 fed 3? I need your help on what the current state of the law is following the Dictato and SAFL Supreme Court decisions and subsequent Ninth Circuit decisions. Okay. I think it's pretty clear. This case is different than SAFL. It's similar to SAFL, but it's a little bit different than SAFL. But the Supreme Court said, told the Ninth Circuit to make a decision whether or not the four-and-a-half-month delay was an unreasonable period of time, and then if it was in California law, then it's not pending, and therefore, it's not told. That's what the Supreme Court asked this Court to decide. And when the case came back here, this Court decided that, and it cited several cases at page 3, 1035, cited several cases where there was an 18-month delay, for example, and a 15-month delay, and they passed on the merits, therefore, it wasn't regarded as untimely. So the Ninth Circuit said the four-and-a-half-month delay, he's entitled to tolling. I mean, not the Supreme Court. This Court said in SAFL 2. Now, since then, there's only been a few cases that have come down. Well, we've had Welsh in this Court. Yes, Your Honor. But it was a remand. I mean, there's no real definitive answer to the question, what is an unreasonable delay between the various levels of the state collateral proceedings? There's no answer yet that I can find. And that's why I'm happy to be before this Court, because I want this Court to answer that question. And that question can be answered very simply. And until California makes the law clear and consistently applies it, there is no default. This is not untimely. What about that California citation of a case of unreasonable delay? Henry Robbins? Yes. That's what they're saying in this case. But there's no case saying what is an unreasonable delay. I mean, they're inconsistent. California's inconsistent. If you look at SAFL 2 at page 1035, there's a whole bunch of cases quoted by the Ninth Circuit in that case, where one was an 18-month delay, one was a 15-month delay. And then the Court concludes, second and more important, none of these orders of the California Supreme Court contains the words for lack of diligence, which means untimeliness, which is to say they are denials made solely on the merits, meaning they didn't consider this delay of 18 months and 15 months an unreasonable period of time. Well, the question was whether the delay that when they cite Robbins, are they referring to the delay between the decision of the Court of Appeals in the habeas case and the petition to the California Supreme Court, or were they talking about the initial delay before bringing habeas in the first place, which in SAFL's case was long before ADPO even came into. In SAFL's case, as well as in this case,  Now, in the SAFL case, it was a five-year delay. In this case, there's a nine-year, I mean, 11-year delay. And the Superior Court, the first denial by the State Superior Court back in 1996 was the 11-year delay. So in this case, it's really clear that California, the only real ruling on this case by a Superior Court or any court except for the citation of N. Ray Clark or N. Ray Robbins was the 11-year delay. They don't talk about this delay here. So there's no ruling, really. It's ambiguous. But whether it is or not, you know, the law has to become clear. I mean, we have a T rule that applies to the prosecution. Well, give us a break on this side. I mean, make the rule clear so we know. And until that rule is clear, it's not really fair to come down with the rule and then slam the inmate because he didn't understand the rule because it wasn't clear. So you've got a Teague problem, as well, is the way I look at it. But let's get back to what I've got some more points I'd like to make. Well, your time ran out. Okay. It's been very helpful. All right, real quick. Well, you don't waive anything, you know. We studied the briefs. Well, I've got two real quick things I'd like to say. One, if the district attorney has three years to litigate and the statute of limitations deal with staleness, that's something the court should consider. Two, I've got several cases. I've got one case, Williams v. Calderon, where there was a 26-month delay where the court sat on a case for 26 months. Now, if it's okay for the DA to sit for three years before he gets to litigating, and if it's all right for the district judge to wait 26 months before he makes a decision, then give the defendant a break. Thank you, counsel.  Thank you. Good morning, Your Honors. I'm Morris Bates of the California Attorney General's Office. Let me address the merits first. It's summarized in a two-page excerpt in the supplemental excerpts of records. If the court is at all interested in the merits of the underlying claim, I think it can be clearly and easily grasped reading pages 45 to 46 of the supplemental excerpts of record. As for the issue that the court has framed, the question here is procedural default. Can we get to the merits? Pardon? Should we have anything to say about the merits? I don't think the merits are at issue here. I don't think the merits are going to be a problem for us. But if the court is interested in the merits, and I'm responding only to counsel's initial raising of that particular matter, so if the court wishes to see a little more about it, there is a description of the issues on the merits at pages 45 to 46 in the supplemental. Madam Clerk, would you start the clock, please? The courts framed the issue in terms of procedural default versus whether a petition or an application was not properly filed under the statute of limitations of the AEDPA. There's a difference between procedural default and proper or timely filing, and that's what's really at issue here. The procedural default is one that we can raise with the district court in the event that this case does go back. Counsel, let me tell you a concern I have. It looks to me like the way things have shaken out after Dictato, after Saffold, after they played out again back in the Ninth Circuit, that the times between this man's superior appellate and Supreme Court petitions in California are all going to be told. Is that right? It looks like that, yes, based on current Ninth Circuit precedent. The only question is, well, there are two issues. The first one goes to the first case raised by the court in its letter, and that's the issue of Dictato versus Ducharme, whether the initial filing in the superior court by the petitioner back in November of 1996 was properly filed or whether it was denied because of procedural default. I think in light of Dictato versus Ducharme, I'm not in a position where I can say that it was not properly filed. I think in reading the case and governed by the precedent of Dictato, the superior court's denial of the application, I believe, again, based on the case law of the circuit, was not for improper filing but because of the unjustified delay in presenting the claim to the court. Well, is time told from then on? Your Honor, it's a good question. There is a case that I think Judge Reinhart authored called Telema versus Long, in which the petitioner filed a claim in one court and never pursued that claim and filed another claim and pursued that claim. And under Telema, if I'm not mistaken, the application that was filed but never pursued or never presented to the federal district court under the ADPA, nevertheless, under the precedent of this court, told the statute. So your success here really depends on when the starting bell rang. Is that correct for him? It's rather difficult. It depends on what the starting bell is. Again, I guess that's what I meant, whether he can wait until he gets the last answer from CDC, from the Department of Corrections, or whether he had to start earlier than that. Is that correct? You've got to set a long time and think about it. What I think the issue is, is whether the delay between the denial by the court of appeal back in September of 1997 and his filing in the California Supreme Court in July of 1998, about nine months, ten months later, and whether the Supreme Court, California Supreme Court's rejection of the petition by citation to Robbins and Dixon, was a denial because it was not properly filed, in which case the case goes away, there's no tolling, or because of procedural default, because of due diligence, in which case it's assumed that the case was properly filed but then rejected. So, counsel, you rest your argument on whether or not the Supreme Court's denial was on timeliness. Is that where you rest your argument? Yes, Your Honor. Your Honor, we go back to Saffold v. Carey, which is the other case cited by the court and recently decided. That one seems to be the one most applicable here. It involved a delay of, I think it was about four or four and a half months, between the denial in the lower court and the presentation of the claim in the California Supreme Court. The California Supreme Court denied it then with citation to a timeliness bar. A citation to a case? Yes. And so, I'm sorry? Which reflected an untimeliness in the filing, yes. So your position is the citation to Robbins was sufficient to indicate a timeliness bar? It is sufficient to indicate a timeliness bar. And what's your strongest case authority to support your argument in that regard? Is it Saffold? Saffold v. Carey. And Saffold v. Carey went against the state because the petitioner presented California Supreme Court minute orders denying other habeas corpus applications on the merits that were, as the court said, tardier even than Saffold's. So how do you distinguish Saffold from this case? Here we've got a nine, ten month delay and we've got no showing that other similarly or other filings at the same time that this petition was filed were denied on the merits for reasons that are related here. Are we entitled to assume that if the California Supreme Court was satisfied with an 18 month delay about the time of Saffold, that it would still be satisfied with an 18 month delay? If the California Supreme Court on the same day denied this particular petition under Saffold, denied on the merits another petition that was longer in the delay between the court of appeal denial and the Supreme Court application filing, we lose because that's Saffold. Saffold says we've got five other minute orders. See, if the California Supreme Court is willing to entertain cases after an 18 month delay, but it has changed its mind and not told anybody, I don't know why we would accept that. The rule wouldn't be clear, it wouldn't be uniformly applied, presumably. Again, I think there's no disputing that, Your Honor. The question then becomes is that are we talking procedural default, which assumes that the claim was properly filed? Or are we talking about whether the petitioner even got through the door? Well, it seems to me there are three possibilities. One, they looked at the case and they said he is delayed too long in starting this process back in superior court, and that's why we're citing the untimeliness bar. A second, in which case, that's what we concluded in Saffold, and it didn't prevent the petitioner from proceeding. They could also be saying it's untimely because of the delay between the court of appeals and here. Yes. Now, if they said that, that petition is still properly filed, isn't it? I mean, he went to the clerk and he... I don't think so, Your Honor, in light of Saffold. I thought Dittato, after it was all over, said that it's properly filed despite being untimely. Well, in Dittato, again, you get to the issue of is it properly filed or is it untimely? Or, in other words, was it filed because of lack of due diligence, in which case the court looks at it and may or may not grant relief, may or may not pursue the matter depending on... That's a different issue than whether it's properly filed. Properly filed, I thought, was if it goes into the clerk's office and is accepted as a pleading, then it's properly filed. Exactly. The question is, it's a question of how far through the door you go. If you get through the door and the court looks at the petition, looks at the merits, decides that you waited too long, you did this, you did that, but you failed to do something else, it's properly filed, but it is denied because of procedural default reasons. If the petition comes to the court, but it is not properly before the court, the court does not look at the merits. The court does not look at when you filed, how long it's taken you to file. The court to receive this kind of an application. Do you consider that a procedural default? At this point, I think it's properly filed. It's been properly filed. I think there's every reason or some bait getting around the bar to a rule, but when we look at procedural default, we're dealing with the merits and on the procedural elements. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Bye. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. The defendant acted voluntarily. Thank you. Good morning, Your Honor. May it please the Court, I'm Chris Cabanillas from the District of Arizona. The bottom line is the defendant was not arrested on September 26th. He was, however, arrested on October 12th. Your Honor asked what's the authority that allows an officer to arrest without a warrant in a public place, Payton v. New York. And cited within that case, and I apologize, Your Honor, this case is not in any of the pleadings, so I just respectfully ask for the right to at least cite it. What was the, against New York, what was the first? Payton v. New York. And that's the case that actually ruled that an officer needs a warrant, an arrest warrant to arrest somebody in their home. Inside that case, I believe, there's another case that they cite, which is actually the one that stands for that principle that you can arrest someone in a public place without a warrant. You just have to have probable cause. And the defendant does not dispute that the officers had probable cause on October 12th. So your view is on his porch is? I'm sorry? Well, I guess your point is that he wasn't arrested, but if he was arrested, do you think they could do it on his front porch without a warrant? Sure. And actually, the defendant in this case, though, was not arrested on September 26th. Again, I get a little bit confused about whether the defendant's arguing there's an illegal arrest on the 26th or October 12th. Well, I think he's arguing here, the 26th. I don't know that it was argued in the district court. On that point, Judge Canby, this case really should be reviewed for clear error. I mean, for plain error. I'm sorry. The defendant did not argue below that he was illegally arrested on September 26th. His argument, if you look at the pleadings and also the hearing and also the magistrate's ruling, he never argued that he was illegally arrested on the 26th. He argued merely that his statements and his consent were coerced based on some statement the agent made about not having an attorney for 72 hours. And if you look at the hearing, it's all geared to that. Judge Rawlinson, you're correct that because the district court found that the defendant had freely and voluntarily provided evidence and statements, that is reviewed for clear error. And everything, again, overall would be reviewed for plain error if the court decides to review this issue. Counsel, do you agree with opposing counsel that the Secret Service agent said that the defendant was officially detained? I believe when Agent Sheridan was asked the question, I think he said he was detained. But that does not mean arrest. And also that would not undercut in any way the fact that the defendant had freely and voluntarily went with them, as you noted. I'd like to give the court two S.E.R. sites where the defendant himself testified, quote, I agreed to go with them. That's at S.E.R. 66 and at S.E.R. 73. On both of those times, the defendant stated that he agreed to go with them. I think that's significant. Additionally, although this defendant also met the agents at the door, I know that in the reply brief the defendant said something about how the officers can't cross the curtilage. I filed a supplemental citation of legal authority citing U.S. v. Hammett. This court's decision would state that an officer can cross the curtilage of someone's home to talk to them at the front door, and that's exactly what happened here. And the defendant, again, opened the door. They didn't even knock. The defendant himself opened the door and met the agents, and that reference is at S.E.R. 73. The defendant also was told he was not under arrest. The defendant, again, he testified. He's told right off, the officers told him he's not under arrest. That's at S.E.R. 69, S.E.R. 69. He's told he's not under arrest. And we know that he wasn't under arrest because later when they take him back to his house and they're searching, not only does he voluntarily give up where these weapons are located, which, again, would dissipate any possible taint that may have arisen from taking him to the station,  He remains at home. So, again, he's not arrested. If you contrast that with what occurred on October 12th, you know, when Agent Sheridan runs into the defendant and he had probable cause, he was going to arrest him anyway, he's arrested in a public place. So, again, there was nothing wrong with that arrest and is supported by probable cause. And on that occasion, he's handcuffed in the front, he's taken to an interview room, and Agent Sheridan explains that that occurs because he is now under arrest as opposed to what occurred before. When he was not handcuffed, when he was questioned, the agents didn't have weapons at that time, and the defendant was taken to a sheriff's office. He wasn't taken to an interview room or a holding cell. So, again, the... What did he move to suppress when he made the motion? It appears, if you best case, that he had moved to suppress the weapons. There's a one-liner motion in his motions that he filed, and this is at SER No. 2. It says, Motion to suppress weapons seized from defendant's home. And it appears that would have been what he allegedly suppressed. Well, it's puzzling to me. The only weapons that were seized were seized on the 26th, weren't they? Correct. So he makes a motion to suppress the weapons seized on the 26th, but he doesn't argue that he's arrested on the 26th. Correct. He based it on the notion that his consent and his statements were coerced. Okay. Then his convictions are for threatening, and was there a felony in possession? Yes, but that one, he was acquitted of that by the bench trial, and that's in one of the first footnotes in the government's brief. That was not before the jury. So his only conviction was? Count 1 through 7, the threats to the Vice President of the United States, President Clinton, and Lieberman. Well, did the gun have anything to do with that? Well, Your Honor, again, in our brief, we set forth that even without these weapons, there was more than sufficient evidence to convict this defendant. I don't have any problem with sufficiency, but it's not a sufficiency. Right. Well, let me clarify that then. Again, I think this is a plain error case. There was no error. There was no error that was plain that affected substantial rights or caused a miscarriage of justice. What I was thinking the weapons might be significant for is people say, I'm going to kill somebody without meaning it or with meaning it, and the weapons might have inclined the jury to think he was a little more dangerous and that he meant it more. Well, let me address that. So it's not the locality, whether everybody has weapons. You bet. No, and I understand where you're going there, but let me just assuage your fears that this jury heard testimony from multiple witnesses about the defendant having weapons. The book, which I don't think the defendant moved to suppress, the ultimate sniper in there, they mentioned a Remington 700. Mangles testified that the defendant had a Remington 700. Additionally, the defendant's own statement to Agent Sheridan when he called him, I can't remember if it was October 2nd, but he called him and said, I used to be a special ops person who put someone away 1,000 yards using my rifle. Again, that shows the weapon. Lonberg, witness, testified the defendant had used or had handled weapons when he was threatening. The witness who testified that he made one of the weapons and that he gave it to the defendant. So there was sufficient evidence independent of the weapons that the government had never introduced the weapons to show that this defendant was serious. I just don't care if it was sufficient because it's not an insufficiency of evidence. I'm using the wrong language. I apologize. I'm using the wrong language. What I'm saying is there's no miscarriage of justice because the jury would have convicted even if they hadn't had the tangible weapons, even if they didn't have the pictures of the weapons. That's what I mean. If I'm using the wrong language, I apologize. I'm using the Jackson v. Virginia language, and I keep getting confused. Well, even if you look at harmless error, then I would argue that it's harmless beyond a reasonable doubt because the jury would have convicted despite the admissibility of that evidence, and that's the test. If the court applies harmless error, and I would submit this Court should look at plain error, and even if the error is plain, again, only reverse if there's a miscarriage of justice. So if you look at it for harmless error, error was harmless. If you look at it under plain error, there was no error which caused a miscarriage of justice. The reason I say that is because you're thinking if the weapons were before the jury, this would have been the reason they would have convicted. It would not have been the reason based on the record we have before us. There was sufficient evidence to show the defendant had weapons. Any error in introducing the tangible weapons was harmless, and that's how I would leave it. I also wanted to note that I cited in that same supplemental citation of legal authority a case called CALP. I don't know if Your Honor had received that supplemental citation, but that's a Supreme Court case from May 5th of this year. It also deals with illegal arrest. And in that case, I believe that case actually demonstrates the legality of what occurred here on September 26th. In that case, a juvenile individual was rousted at 3 a.m. by the police in his home, flashlight in the eyes. We need you to come down. The defendant says okay. They transport him in handcuffs, and he's transported, and ultimately he's arrested that same day. Those facts are remarkably different from what happened here. I would also note that the defendant, when he was handcuffed for the ride, was told why. Not only had he been told he was not under arrest that day, but he was also told, by the way, we're handcuffing you just for the ride, pursuant to policy. And that would demonstrate to a reasonable person that when the agents told him he wasn't under arrest, he was, in fact, not under arrest. And, again, he was allowed to remain at home after the search was completed. Thank you, counsel. Thank you. The difficulty here is that the defendant was convicted directly because of items seized on the 26th. There was nothing other than that. The two witnesses, the neighborhood witnesses, one was an elderly lady that couldn't even identify him in the courthouse at the time of the trial, and the other one was a younger man of questionable background. Didn't somebody testify, we got this call at our office? There was an FBI agent night person that testified that he got a call from somebody that ultimately identified himself as Alfred Crutchley. It wasn't recorded, and it could have been anybody calling and getting that sort of a problem. Counsel, do you agree with opposing counsel that you did not challenge the September arrest at the district court? I wasn't a trial lawyer. Do you agree that defendant's counsel did not challenge the September arrest in the district court? I don't. Okay, so we can look at the record to see if that's true. I think the less than artful approach still included a challenge to all aspects of what I believe to have been an arrest on the 26th. And I think the judge considered that. Thank you, counsel. Thank you. United States v. Crutchley is submitted. Next is Singh v. INS. I wonder if everybody is. Do we have everybody here for Singh? Counsel.
judges: Canby, Kleinfeld, Rawlinson